AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| **In the Matter of the Search of:** ) <br> ) <br> 125 N. Parkside Dr, #201H, Colorado Springs, ) <br> Colorado 80909, more fully described in Attachment ) <br> A, attached hereto, and to include all out-buildings ) <br> and vehicles located thereon. ) <br> ) | Case No. 21-sw-01191-NYW |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the ___State and___ District of ___Colorado___, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to distribute controlled substances |
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm |

The application is based on these facts:
X Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Andrew Cohen*
*Applicant's signature*

Andrew Cohen, Special Agent FBI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **22 Nov 2021**

*[signature]*
*Judge's signature*

City and state: Denver, CO

The Hon. Nina Y. Wang
*Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

125 N. Parkside Dr, #201H Colorado Springs, Colorado 80909



The premise to be searched is an office space located on the 2nd floor of a commercial office building at 125 N. Parkside Dr, #201H, Colorado Springs, Colorado 80909. The unit has two doors that provide access to the unit. One of the doors is off white in color, has an electronic keypad on the door and a mailbox to the side of the door with the letters "201H" on it. The other door is a brown door with no markings and is directly down the hall to the north of the off-white door. The premise to be searched includes the office space and all rooms, attics, storage areas, floors, walls and combination safes, lockers and lock boxes, briefcases, containers, trash areas, any vehicle associated to occupants of the premise at the time of the execution of this warrant, as well as the persons of adults located at the premises at the time of execution of this search warrant.

## ATTACHMENT B

### **DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED FOR**

Evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841 (possession with intent to distribute and distribution of a controlled substances) and 846 (conspiracy to distribute a controlled substance), and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) and particularly the following:

1. Heroin, fentanyl, and methamphetamines.

2. Paraphernalia commonly associated with the use, packaging for sale or transportation of narcotics consisting in part of and including, but not limited to paper and plastic bindles, plastic bags and/or baggies, labels, scales and other weighing devices, measuring devices, pipes, and containers commonly associated with the storage and use of controlled substances

3. Firearms, firearms accessories, ammunition and records related to the ownership of such items and any items found near any firearms or ammunition tending to show who possessed and controlled them.

4. Any documents related to or used to assist in the procurement or distribution of controlled substances, including to notes, customer lists, supplier lists, correspondence, and ledgers.

5. Evidence of the identity of co-conspirators, suppliers of controlled substances, and purchasers of controlled substances, such as telephone and address books, telephone bills or toll records, diaries, ledgers, journals, papers, caller identification devices, cellular telephones, telephone records, and electronic rolodexes.

6. Any information identifying associates engaged in distributing or purchasing controlled substances and/or the laundering of proceeds related to distribution of controlled substances.

7. Cash, currency, jewelry, financial instruments, and/or records relating to the laundering, secreting, and/or distribution of monies related to the proceeds of procuring or distributing of controlled substances, and any and all financial documents and records which may evidence financial transactions relating to obtaining, transferring, laundering, secreting or spending the proceeds of the sale of controlled substances.

8. Photographs showing controlled substances or firearms and people in possession of controlled substances or firearms.

9. Any safe deposit box keys, storage keys or records pertaining to safe deposit boxes or storage units or areas where controlled substances may be located.

10. Indicia of ownership or occupancy of the searched property and items seized.

11. Cellular phones, tablets, or other electronics capable of communicating on the internet.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Cohen, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the FBI and have been since 2014. I am currently assigned to the Denver Division of the FBI, and specifically to the Southern Colorado Safe Streets Task Force. I investigate money laundering and drug trafficking in the normal course of my duties, and I am fully familiar with the facts of the case. During the course of my career, I have been an affiant on several Title III wiretap affidavits related to narcotics, and I have participated in several narcotics investigations involving controlled substances, including, but not limited to, heroin, fentanyl, cocaine, marijuana, and methamphetamine. I also have investigated individuals in other cases involving controlled substances and the possession of firearms by prohibited persons.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. In sum and as set forth below, my investigation to date reveals probable cause to believe that Chris Johnson, and others both known and unknown, are distributing illegal drugs and unlawfully in possession of firearms. Based on my training and experience and the facts set forth in this affidavit, I submit there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841 (possession with intent to distribute and distribution of a controlled substances), 846 (conspiracy to distribute controlled substances) and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) (hereinafter the "TARGET OFFENSES") will be found at 125 N. Parkside Dr, #201H, Colorado Springs, Colorado 80909, (hereinafter the "TARGET LOCATION").

4. This TARGET LOCATION is more fully described in and shown in a photograph in Attachment A. I respectfully request the issuance of a warrant to search the property described in Attachment A for evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES identified with particularity in Attachment B.

*Background of those mentioned in this affidavit*

5. **Christopher Johnson, date of birth 06/04/1983:** Johnson is a seven-time convicted felon. I have reviewed his criminal history and learned the following related to his felony convictions. All cases stem from El Paso County, Colorado unless otherwise noted.

   A. In 2017CR5465, Johnson was convicted of Escape, a class 3 Felony and sentenced to four years Department of Corrections (DOC) on 05/16/18.

  B. In 2017CR201, Johnson was convicted of Introduction of Contraband, a Class 4 felony, and was sentenced to four years DOC on 05/16/18.
  C. In 2016CR4286, Johnson was convicted of Possession on Controlled Substance, a Drug Felony class 4, and was sentenced to one year Community Corrections on 8/28/17.
  D. In 2006CR4163, Johnson was convicted of Escape, a class 3 Felony and was sentenced to four years DOC on 10/12/06.
  E. In 2006CR236, Johnson was convicted of Motor Vehicle Theft, a class 5 Felony and was sentenced to three years DOC on 05/01/2006.
  F. In 2005CR2590, Johnson was convicted of Criminal Impersonation, a class 6 Felony and was sentenced to three years DOC on 06/16/2005.
  G. In 2003CR1780, Johnson was convicted of Possession of Controlled Substance, a class 5 Felony and was sentenced to three years DOC on 05/01/2006.

6. Johnson also has an active arrest warrant issued by the Colorado Department of Corrections for a parole violation. The warrant was issued on 07/20/2021 after he was released on parole on 06/23/2021

7. Johnson's criminal history information is provided by a way of background to the court and his prior criminal history is not intended to be the sole determining factor of probable cause for the requested search warrant. Johnson's prior criminal history is relevant to establish the suspected violation of 18 U.S.C § 922(g)(1) (felon in possession of a firearm).

*Information about fentanyl*

8. Based on prior drug investigations, the FBI and Colorado Springs Police Department ("CSPD") know fentanyl to be a powerful synthetic opioid which has a very similar effect on the human body to other opiates and opioids. I have investigated other cases in which fentanyl caused an overdose resulting in death.

9. Many fentanyl compounds have been manufactured to mirror the appearance of prescription opioids, specifically the Mallinckrodt Pharmaceuticals 30mg Oxycodone Hydrochloride, which command a much higher price per weight on the illicit market than heroin. Fentanyl pills which are sold under the guise of oxycodone 30mg tablets are blue in color and have imprints which say "M" and "30." Because of these physical characteristics, they are often referred to by drug users and drug dealers as "blues," "M30s," or "30s."

10. According to a U.S. Drug Enforcement Administration website (https://www.dea.gov/druginfo/fentanyl-faq.shtml), fentanyl is 30-50 times stronger than heroin. This relative strength often results in inconsistent dosages when they are not mixed in a compound with the standards of care in the commercial industry. As a result, it is common for fentanyl compounds, when sold as either heroin or prescription opioids, to either have significantly more or less of an effect on the human body than a regular dose.

*Information from a Confidential Human Source (CHS1)*

11. A Confidential Human Source, hereinafter "CHS1," was developed during the investigation. CHS1 has a prior felony criminal history, including convictions for burglary and drugs. CHS1 has substantial knowledge of drug related activity and is a drug user seeking rehabilitation. CHS1 has provided information to other law enforcement in the past and appeared to have provided reliable information.

12. CHS1 is providing information as a concerned citizen in an effort to reduce drug trafficking. As of the date of this affidavit, CHS1 has not received any compensation for his/her information but likely will in the future. I am unaware of any grudge, vendetta, or debt that CHS1 has with Johnson.

13. Although he/she has not been a CHS for the FBI for long, CHS1 has provided substantial information to law enforcement to date that law enforcement has been able to corroborate and/or verify, including prior information to other law enforcement agencies as a confidential source of information. CHS1 has provided names, phone numbers, and Facebook accounts of individuals previously mentioned in drug investigations. I have spoken to other investigators who have worked with CHS1 in the past, and I am unaware of any information that would detract from CHS1's credibility or reliability.

14. Most recently, CHS1's information led to several seizures of fentanyl pills and multiple firearms. On more than one occasion, the information CHS1 provided to law enforcement was consistent with evidence recovered based on CHS1's information including types of firearms, caliber of firearms, locations of firearms, and recovery of fentanyl.

15. CHS1 is familiar with firearms and knew the difference between a revolver and semi-automatic handgun. Investigators believed he/she would be able to distinguish between a real gun and a simulated gun (like a BB or airsoft gun).

16. I submit that CHS1 is familiar with many different types of illegal drugs, their street prices, the identification of illegal drugs, and the types of equipment used in furtherance of illegal drug sales.

17. CHS1 has also been shown photographs without any identifying information and positively identified Johnson.

*Information Provided by CHS1*

18. CHS1 told investigators about Johnson. CHS1 stated that Johnson was a drug dealer and sells firearms. CHS1 knew the address of the location Johnson stores drugs and firearms, the TARGET LOCATION. CHS1 knew details of the layout of the TARGET LOCATION, and that Johnson recently has been keeping a motorcycle inside of the TARGET LOCATION. CHS1 suspected the motorcycle was stolen.

19. CHS1 has been to the TARGET LOCATION multiple times over the last several months and has purchased drugs from Johnson prior to his/her cooperation with law

enforcement. CHS1 has not purchased drugs from inside the TARGET LOCATION. CHS1 has seen a handgun inside the TARGET LOCATION as recent as mid November of 2021.

20. CHS1 has been present when Johnson sold drugs to others at the TARGET LOCATION. CHS1 believed Johnson sells a variety of illegal drugs, including fentanyl pills, heroin, and methamphetamine from the TARGET LOCATION.

21. CHS1 has also seen Johnson in possession of firearms over the past several months in places other than the TARGET LOCATION. CHS1 stated that Johnson travels with a handgun and illegal drugs on his person and sells firearms to others. CHS1's information tended to be corroborated by Facebook information discussed below.

*Information about a Source of Information (SOI1)*

22. A Source of Information, hereinafter "SOI1", was also developed during the investigation. SOI1 has a prior criminal history for assault and was recently encountered by law enforcement while in possession of methamphetamine, heroin, and fentanyl pills. SOI1 is a drug user and has knowledge of drug activity. SOI1 provided information in hopes of leniency of pending criminal charges. I am unaware of any grudge, vendetta, or debt that SOI1 has with Johnson.

23. I am not aware of information that SOI1 has provided to law enforcement in the past. SOI1 did provide information about other individuals not mentioned in this affidavit, including phone numbers and Facebook identifiers.

24. In an unrelated investigation, SOI1's information led to the seizure of methamphetamine, and the information obtained during that investigation was consistent with information provided by SOI1.

25. SOI1 was shown a photograph of Johnson without any identifying information and positively identified him.

26. To be clear, SOI1 and CHS1 are different people and provided information to the FBI at different times, several weeks apart. I am unaware of any connection between SOI1 and CHS1.

27. SOI1 has purchased more than one firearm from Johnson during the summer and fall of 2021. These firearms were not purchased inside the TARGET LOCATION. SOI1 stated that the serial numbers were obliterated on the firearms when he/she purchased them from Johnson. SOI1 was no longer in possession of the firearms at the time SOI1 provided information to law enforcement.

28. At the direction of law enforcement, SOI1 sent messages to Johnson to try and obtain firearms and or illegal drugs from Johnson. SOI1 was in custody at the time and there was a limited window of opportunity for Johnson to arrange a transaction. The transaction never happened, although I submit that had there been additional time available Johnson would have likely sold a firearm or illegal drugs to SOI1.

*Information about a second Source of Information (SOI2)*

29. A second Source of Information, hereinafter "SOI2," was developed during the investigation. SOI2 has a prior criminal history for forgery, drugs, and other charges that could reduce his/her credibility. SOI2 was recently encountered by law enforcement while in possession of fentanyl pills. SOI2 is also drug user and has knowledge of drug activity. SOI2 provided information in hopes of leniency of pending criminal charges. I am aware of personal disagreements between SOI2 and Johnson, but I do not believe that has affected the truthfulness of SOI2's information, and I have taken extra steps to corroborate SOI2's information.

30. I am not aware of any information that SOI2 has provided to law enforcement in the past. SOI2 did provide information about other individuals not mentioned in this affidavit, including phone numbers and Facebook identifiers. These individuals were previously known to investigators in ongoing drug investigations.

31. SOI2 was shown a photograph of Johnson without any identifying information and positively identified him.

32. To be clear, SOI1, SOI2, and CHS1 are different people and provided information to the FBI at different times, several weeks apart. I am unaware of any connection between SOI2 and SOI1.

33. SOI2 has purchased fentanyl from Johnson during the summer and fall of 2021 and has been inside the TARGET LOCATION as recent as mid-October. SOI2 reported that Johnson has a motorcycle inside of the TARGET LOCATION which is supported by CHS1's information.

*Review of information obtained from previous Facebook Search Warrants*

34. Department of Corrections Parole Officer and Bureau of Alcohol, Tobacco, Firearms, and Explosives (BATFE) Task Force Officer Hathaway applied for a search warrant for a Facebook accounting belonging to Johnson.

35. This search warrant was presented in the 4th Judicial District, El Paso County, Colorado and granted on October 19, 2021 by El Paso County Judge Steve Katzman. The search warrant authorized the seizure of private messages within Johnson's account from June 1, 2021 to October 14, 2021.

36. The information returned from Facebook related to Johnson's account was voluminous and contained over 7,350 pages in a .PDF document. I have not reviewed all of that information and I am including only some of the information I did locate related to Johnson's drug distribution, firearms possession, and information as it relates to the TARGET LOCATION itself.

37. On November 2, 2021, I also applied for and was granted a search warrant in the District of Colorado for the Facebook account related to Johnson. The search warrant was

granted by Magistrate Judge N. Reid Neureiter.  In summary, I located evidence that supported CHS1, SOI1, and SOI2's claims that Johnson sells drugs and firearms.  I further located information where Johnson gave the TARGET LOCATION to other Facebook users as a meeting location for drug transactions.

38. For example, on or about 9/26/2021, a user named "Zto Thao" sent Johnson a message that read, "You got another zip."  I know from my training and experience that a "zip" is common street slang for an ounce, or 28 grams, of illegal drugs.  Johnson replied, "Umm like almost a zip."  Additional messages indicate that Johnson and "Zto Thao" did indeed meet.  On or about 9/27/2021, "Zto Thao" asked Johnson, "U got more?"

39. On or about 9/28/2021, "Zto Thao" said, "This shit got some bad cut in it," followed by a photograph.  Based on my training and experience, I recognize the white crystalline substance in the photo as suspected methamphetamine.  I also know that drug dealers oftentimes put "cut" into their products in order to increase the weight of the product and ultimately their profit margins.



*Photo sent by "Zto Thao"*

40. On or about 9/7/2021, user "Meagan Garcia" sent a message to Johnson stating, "Hey know anyone that would trade for food stamps?"  Johnson replied, "Trade what."  Garcia replied, "Cash or dope."  Johnson replied, "Yea I'll do it."  Additional messages indicate that Johnson and Garcia ultimately did meet.

41. On or about 10/31/2021, user "Lilly Noel" said to Johnson, "I'm needing some blk right now been hurting all day…"  Johnson then gave "Lilly Noel" the TARGET LOCATION.  Based on my training and experience, "blk" or black refers to heroin.

42. Johnson also exchanged messages with Adam Zwetzig (user adamzwetzig155811) through Facebook.  On or about 08/04/2021, Johnson sent a message to

Zwetzig stating, "Idk what's up with cam bro but I still need like 70 blues can we get them else where." Based on my training and experience, blues refer to fentanyl.

43. On or about 09/01/2021, Johnson sent a message to Zwetzig asking, "U get the stuff." Zwetzig replied, "I got clr but not the blues." Based on my training and experience, "clr" or clear refers to methamphetamine. I believe Zwetzig was stating that he was able to obtain methamphetamine, but not fentanyl pills.

44. On or about 09/06/2021, Zwetzig asked, "You got a ball." Johnson replied, "Umm idk close to it for sure." I know from training and experience that a ball is common street slang for approximately 3.5 grams of illegal drugs.

45. On 09/16/2021, Johnson sent a photo of himself to Zwetzig holding an undetermined amount of cash. Based on my training and experience, I know drug traffickers often carry large amounts of cash from the proceeds of their drug trafficking.

46. Johnson also sent Facebook messages to Mathew Jones (user mathew.jones.5680) The profile photo of the account is consistent with Jones' 9/23/2021 El Paso County Criminal Justice Center booking photo.

47. During September of 2021, Jones had a conversation with Johnson related to drug distribution and weapons trafficking. Johnson sent several photographs of multiple weapons to Jones, and it appears met multiple times to sell heroin and methamphetamine. In the messages between the two, Jones asked several times for Johnson to provide him with heroin (black) and fentanyl (blues).

48. On or about 09/08/2021, Jones told Johnson, "I found somewhere to get the pieces cheaper and I wanted a subcompact in the first place." Johnson replied, "Ok well I just got some more today….a 41 caliber and a 38…And a Ar." Jones inquired about the price of the AR, and Johnson replied with, "9" and also sent the below photograph. Based on my training and experience, I believe a "41 caliber" refers to the caliber of ammunition shot from a revolver, a "38" refers to the caliber of ammunition shot from revolver, and an "Ar" refers to a style of rifle (as shown in the photograph below). I submit that because Johnson said, "…I just got some more today.." it supports CHS1's information that Johnson traffics in firearms.

49. On or about 09/21/2021, Jones asked Johnson, "How much for the 1911?.... What kind of 1911 and is that all you have?" I know from training and experience that a 1911 is a style of .45 caliber semi-automatic handgun. After this exchange, several phone calls occurred between Jones and Johnson, and eventually Johnson replied with a photograph of a 1911 pistol, a rifle, magazines, and two revolvers.



*AR-15 rifle sent to Jones from Johnson*



*AR-15 and other handguns sent to Jones*

50. On or about 10/29/2021, Facebook user Steve Kevari (user ID 100015527493733) asked Johnson, "You have blues." Johnson and Steve discussed selling 20 of the blues for $140, and Johnson told Steve that he is located at "his office" and provides the address of 125 N Parkside, the building of the TARGET LOCATION. Steve later said, "I'm here," and Johnson replied, "Walking out." I submit that on or about 10/29/2021, Steve likely came to the TARGET LOCATION to purchase fentanyl.

51. Johnson also gave the address of 125 N Parkside, the building of the TARGET LOCATION, to user Donnita Hickox on 10/27/2021, user Mariah McKay on 10/26/2021, user Lilly Noel on 11/01/2021, and user Amber Hartness on 10/22/2021.

52. In one of the messages to Hickox, Johnson said, "…I'm just gonna post and serve like 3 or 4 people and then I'll come that way…" Based on my training and experience, when Johnson said he is going to "serve like 3 or 4 people," I submit he actually means he is going to sell illegal drugs to 3 or 4 people. On 10/31/2021, Hilcox asked Johnson, "Did u ever get any

clear today." Johnson replied, "I have some."

53.     In some of the messages, Johnson referred to the TARGET LOCATION as his "office." SOI2 and SOI1 have told investigators that the TARGET LOCATION is Johnson's "office" although I am unaware of any legitimate business that Johnson conducts.

54.     In a 10/26/2021 Facebook message exchange with Jessica Monique Marcos, she said, "I need to buy some blk if u have some." Johnson replied, "Yea" and asked if she can "come to the office."

*Attempted traffic stop on November 8, 2021*

55.     On November 8, 2021, the CSPD and FBI were conducting surveillance during a seemingly separate drug investigation. In order to protect the integrity of that investigation, I am not including all of the details about it. In summary, law enforcement received information about a specific residence involved in the large scale distribution of illegal drugs. During surveillance of that residence, investigators observed a white male exit a black BMW sedan and enter the residence. A short time later, the male left the residence and departed in the black BMW. To be clear, the male was not Chris Johnson.

56.     Investigators followed the BMW and obtained the Colorado temporary license place of 3470754, registered to Nicole Johnson at 125 N Parkside Dr, Colorado Springs, Colorado, Ste 201H. CSPD Detective Mibert attempted a traffic stop on this vehicle, but the vehicle ultimately fled from law enforcement after initially pulling over.

57.     The registered owner of the BMW is believed to be the estranged wife of Chris Johnson.

*Modus Operandi of Drug Trafficking Organizations*

58.     I have experience, training, and communication with other law enforcement personnel who specialize in the area of illegal drug trafficking and the detection and documentation of proceeds from drug trafficking. I also have experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations. Such individuals often have personal knowledge regarding the methods, transportation, and distribution of the drugs and money in large scale controlled substance distribution operations.

59.     I know, based on training and experience, as well as from information relayed to me during the course of my official duties:

   a.   That a significant percentage of heroin, methamphetamine, and fentanyl imported into the United States, currently enters the United States domestic market at various points along the Southwest border of the United States and is then transported to various cities throughout the United States for retail distribution. Furthermore, I know that the importation, transportation, and distribution of heroin and cocaine are controlled by a number of well-organized and sophisticated drug trafficking organizations. I also know that drug trafficking organizations use couriers to transport drugs by vehicle from Mexico to various distribution centers in the United States; they use couriers to transport cash proceeds of drug sales from points of distribution in the United States back to

Mexico, where the proceeds are laundered; and they use "stash houses," premises in which they warehouse large quantities of narcotics prior to their distribution.

   b. That members of these organizations routinely utilize communication facilities including cellular telephones calls, electronic text messaging, and messaging applications accessible on cellular telephones, to communicate with other organization members in furtherance of their illegal goals.  During the course of these electronic communications, organization members commonly use coded language and references and/or encryption in an effort to elude law enforcement detection. Based on training and experience, I know that narcotics traffickers commonly use multiple, prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement, and said traffickers also change cellular phones frequently or use multiple cellular phones to avoid detection by law enforcement officials.

   c. That drug dealers use cellular phones and other communication devices, in which they maintain names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

   d. That drug trafficking organizations store information pertaining to drug trafficking activities on electronic devices, including cell phones, computers, and removable storage media. I further know, based on my training and experience, as well as from information relayed to me during the course of my official duties, that drug trafficking organizations often retain, for long periods of time, such electronic documents and devices, in order to maintain a record of contacts, accounts, income, expenditures, assets, and drug-related debts.

   e. That narcotics traffickers routinely "rotate" electronic devices, including cell phones, in order to avoid detection by law enforcement. For example, a narcotics trafficker may possess multiple cell phones and alternate the use of the cell phones on a weekly or monthly basis, before rotating to another cell phone. Based on training and experience, I know that narcotics traffickers often retain possession of previously-used cell phones, even though such phones are no longer utilized in furtherance of narcotics trafficking.  Based on training and experience, I know that, while such phones may no longer be used for narcotics trafficking activities, the devices often contain electronic data, including call records, contact information, text messages, email, photos, video, and more, which can be evidence of past criminal activity.

   f. That when drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, cashier's checks, money orders, wire transfers, and the like.  Based on training and experience, I know that evidence of such financial instruments, accounts, and other methods of "laundering" drug proceeds may be stored on digital devices, such as cell phones and computers.  I further know that narcotics traffickers often store electronic copies of records and receipts to such financial transactions on digital devices, such as cell phones.  My colleagues and I have seen, for instance, photographs of money orders, tracking numbers, and cash.

g. That it is common practice for large scale narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotics traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, buses, and rental and private automobiles. I further know that narcotics traffickers often store electronic copies of records and receipts to such travel on digital devices such as cell phones. Similarly, geolocation information stored on devices also may reveal travel and patterns of travel material to the distribution of the controlled substances to obtain and redistribute.

h. That drug traffickers take or cause to be taken photographs or videos of themselves, their associates, their property, and their product; and that these traffickers often maintain these electronic images stored on digital devices such as cell phones. One purpose for doing so appears to be to show and confirm they are in possession of the product they seek to distribute.

i. That drug trafficking organizations maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment rental agreements, cell phone bills, passports, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations. I further know that narcotics traffickers often store digital versions of such documents in electronic devices such as cell phones. My colleagues and I are also aware that more and more commonly such records exist only in electronic form as people more generally move from paper to electronic records to conduct the daily affairs of their life.

j. There are many reasons why drug traffickers maintain digital evidence for long periods of time. The evidence may be innocuous at first glance (e.g., electronic versions of financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, videos and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, records relating to safe deposit boxes, and computer hardware and software), but have significance and relevance when considered in light of other evidence. The drug trafficker may no longer realize he/she still possesses the evidence on a digital device or may believe law enforcement could not obtain a search warrant to search the device and seize the evidence. The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any evidence stored on a digital device. However, that evidence may still be retrievable by a trained forensic computer expert.

k. That drug traffickers are increasingly using computer hardware and software to communicate with co-conspirators and to facilitate the financial transactions associated with both the narcotics deals themselves and with the laundering of the related proceeds. Computer hardware and software may contain spreadsheets of suppliers and buyers, financial records, bank account records, criminal contacts and other information relevant to the investigation of the criminal enterprise.

l.      Finally, I am aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects:  (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).  Rule 41, Fed.R.Crim.P., permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime.

*Summary of evidence*

60.     For the reasons stated above, probable cause exists to believe that Johnson and others yet unknown are engaged in the distribution of illegal substances within the TARGET LOCATION.  Furthermore Johnson has an active felony arrest warrant in the State of Colorado for Parole Violation/Introduction of Contraband.

61.     CHS1's information is deemed to be credible and reliable.  CHS1 has provided other information to law enforcement that resulted in drug and firearm seizures.  CHS1 has seen firearms and illegal drugs within the TARGET LOCATION several times, and as recently as November of 2021.

62.     SOI1's information is deemed to be credible and reliable.  SOI1 purchased guns from Johnson in the past.

63.     SOI2's information was independently corroborated through police investigation and additionally validated against information provided by CHS1.  SOI2 told investigators that Johnson has fentanyl, heroin, methamphetamine, and firearms inside the TARGET LOCATION.  SOI2 has been inside the TARGET LOCATION as recently as November of 2021.

64.     Johnson may reside at the TARGET LOCATION.  Johnson has given the TARGET LOCATION to multiple people in Facebook messages as a place to meet him for drug transactions.  Johnson also has an active arrest warrant and would reasonably be located at the TARGET LOCATION.

65.     The Facebook messages on Johnson's Facebook account support the information provided by CHS1, SOI1, and SOI2.  Based on these messages with others, Johnson is unlawfully involved in the distribution of fentanyl, heroin, and methamphetamine and firearms.

## CONCLUSION

66. Based on the facts set forth above, I submit probable cause exists to believe evidence, fruits and instrumentalities of violations of 21 U.S.C. §§ 841 (possession with intent to distribute and distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance) and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) exist within the TARGET LOCATION described more fully in Attachment A. Therefore, I request permission to search the property identified in Attachment A for the evidence, fruits, and instrumentalities identified with particularity in Attachment B.

*s/Andrew Cohen*
Andrew Cohen
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this _22rd_ day of November, 2021.

_____
HON. NINA Y. WANG
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

**This affidavit was reviewed and submitted by Kelly Churnet, Assistant United States Attorney.**